## No. 13,273.

LEON JOSEPH, FOR THE USE OF HIS MINOR DAUGHTER, EVA JOSEPH, VS. EDISON ELECTRIC COMPANY AND PEOPLE'S TELEPHONE COMPANY, IN SOLIDO.

### SYLLABUS.

1. Each case involving the allowance of damages for personal injuries has its own peculiar features, and an allowance in one case is not necessarily a precedent which should control the allowance to be made in another.
2. Where a young girl is knocked prostrate and senseless upon the public streets, unable to remove herself from public view, by the falling of a pole, and as a result of the gross negligence of two corporations, the one of which owned, and the other of which had excavated about, for the purpose of removing such pole; and suffers great pain and nervous rigors during two weeks, and, thereafter, at the expiration of more than two months, is still a sufferer, the conclusion of the trial judge that $1,000.00 is not an excessive amount to allow, even though the evidence does not show that her injuries are permanent, will not be disturbed.
3. In such case, it is gross negligence for the company owning the pole to allow it to become so rotten as to threaten danger to the passers by, and it is equally gross negligence for a company, which in preparing to remove such pole, makes an excavation alongside of it, and so leaves it, thus increasing the danger of its breaking and falling. The two companies are, therefore, properly held liable in solido to the passer-by on the public street upon whom the pole falls.

A PPEAL from the Civil District Court, Parish of Orleans— Ellis, J.

*Dinkelspiel & Hart* (*Edward Dinkelspiel* of counsel) for Plaintiff, Appellee.

*Saunders & Gurley* for Edison Electric Company, Defendant, Appellant.

*Cage, Baldwin & Crabites* for the Peoples Telephone Company, Defendant, Appellant.

The opinion of the court was delivered by

MONROE, J. Leon Joseph brings this suit on behalf of his minor child, a daughter eighteen years old, and on his own account, to recover damages for personal injuries sustained by her, and resulting loss and expense to him, by reason of the alleged negligence of the defendant companies, as a consequence of which (it is said) a certain pole, used for holding on electric lamp and wires, fell upon his daughter while she was passing on the public street. It is virtually admitted that some injury was sustained by the minor as the result of the negligence of one, or the other, or both, of the companies made defendant, but they each insist that the negligence which was the proximate cause of the injury was that of the other, and they both insist that the amount allowed by the judge *a quo* is excessive.

It appears from the record that the Edison Electric Company consented to yield the site of one of its poles (situated on the southeast corner of Rampart and Clio streets) to the People's Telephone Company. Something was said, in the course of the interviews upon the subject between the officers of the two companies, about written consent, but the evidence satisfies us that it was not intended that the Telephone Company should wait upon that, in so far, at all events, as concerned the preparations which were to be made for the erection of its pole. Upon January 21, 1899, therefore, one of the Telephone Company's employees made an excavation, seven feet deep and four or five feet wide, alongside of the pole of the Edison Company which was to be removed; and, finishing the work at two o'clock in the afternoon, covered the excavation with planks in order to keep wayfarers from falling in. Exactly why the Telephone Company did not at once erect its pole does not appear, but it is likely that it was because it needed the co-operation of the Edison Company, whose lamp and wires were to be removed to the corner diagonally opposite. However, that may be, after two o'clock in the afternoon, the squared pole, by the side of which the

hole had been dug, was left supported on the north and east sides by the
curb stones, in the angle of which it was planted, whilst on the south
and west sides there was no support, the earth having been excavated.
The evidence, including the broken off stump, which has been brought
up as an exhibit, shows conclusively that this pole was rotten, at, and
above, and below, a point on a level with the surface of the earth. It is
also shown that there was rather a high wind during the afternoon and
evening in question. It is not, therefore, surprising, that, as a result of
the lateral strain produced by the wind, taken in connection with the
removal of the supporting earth from the two sides of the pole, which
afforded room for movement, followed by concussion against the curb
stones, the pole should have broken off at the weak point. This occurred
at about half-past six o'clock, and at the moment when the minor, Eva
Joseph, who was employed in a Canal street dry goods store, was
passing on the opposite side of Clio street, returning from her work to
her home. The street is narrow, and the pole, in falling, brought down
with it the street lamp and iron arm to which the lamp was suspended,
as also the wires which were strung on the pole, and Miss Joseph was
struck on the head by the lamp, and on the body and limbs by other por-
tions of the falling wreckage, with the result that she was knocked
senseless to the sidewalk. Two young men who were passing at the
moment came to her assistance and supported her by either arm to her
home, about half a square distant on Clio street. She was unable to
walk, but limped upon one foot only, and was entirely unable to
answer questions. When she reached the residence of her parents, she
was received by her mother, who after some delay succeeded in getting
her into bed, and in securing the attendance of a physician. During
the greater part of the night she was incoherent and restless, and fre-
quently screamed with pain, and it was not until towards morning that
she was able to give an account of her mishap. She was confined to her
bed for twelve days, during which time her mother was obliged to
attend to her wants; and as the mother had been doing the domestic
work of the family it was necessary to employ a servant to do that
work in her stead. Upon the second or third day after the accident, a
physician called upon her, at the instance of the Telephone Company,
and saw her in the presence of her attending physician. He found her
in bed, complaining that she was suffering, but he made no examina-
tion, and his testimony as to the extent of her injuries is based upon
what he learned from the attending physician, and is negative in char-
acter, save that he says that her pulse and temperature were normal,

which probably would not have been the case had there been any serious internal injury. Some ten or twelve days later, that is to say, on February 4th, fourteen days after the accident, another physician, with the consent of the attending physician, called upon her, at the instance of the Edison Company. He found her up, and hopeful that she would soon be entirely well, and complaining of little except loss of appetite. She remained at home for a little more than four weeks, and then returned to the store. But it does not appear that she was free from pain, or in a proper condition to resume work as a sales woman, since she states in her testimony that she suffered from pain in her head and back while so engaged. The family was, however, large and by no means affluent and, though only eighteen, she was the eldest of seven children, and her wages, amounting to five dollars a week, were, no doubt, much needed. Later still, during the last days of March, when she testified in the lower court, she was still suffering from her head and back, and still complained of some swelling of her neck. The attending physician was not accessible when the case was tried, and a certificate from him was introduced in lieu of his testimony. It reads, in part, as follows, to-wit: "Found the patient suffering severely in " different parts of the body, particularly lower limbs and abdomen, " extra, and intra, and about the head generally. Patient was slowly " recovering from the usual signs of shock, developed fever, which ran " from 100 to 103 for several days, which I attributed to the course of " the inflammation in the different parts of the body which had suffered " from the accident. Pain was an incessant feature for almost two " weeks, and patient is not yet free from soreness. * * * I now " believe Miss Eva Joseph to be about completely restored to her " former state of health, with the exception of the soreness about the " right wrist and back, lumbar region, which I presume will be removed " shortly by local treatment; constitutionally, I believe she is otherwise " well."

The judge of the District Court, in a most carefully prepared opinion, reviews the evidence and the circumstances of the case, and reaches the conclusion that the plaintiff ought to recover $106.00 for expenses, etc., incurred by him, and $1000.00 for the use and benefit of the minor, in speaking of whom, and of the accident of which she was a victim, he says:

"Two young men * * * saw her thus knocked down, and ran to " assist her. She was prone upon the sidewalk on her back, speechless, " her eyes wide open and staring, and she unconscious. They tried to

" assist her, but she could not rise. They pulled her up, and one sup-
" porting her on either side, got her to her father's door step, she step-
" ping along on one foot only, unable to walk upon the other.   *   *   *
" She could give no answer to questions, and was shivering. When she
" could speak she complained of her head. Her eyes were swollen and
" her face puffed up and black. She was so nervous that she could not
" be put in bed for more than one hour. During the night and until
" near daylight the next morning, she was in great pain, screaming and
" complaining of her back, legs and head." Speaking of her appear-
ance on the witness stand, he says: "She had in her face, and in its
" expression, the appearance of one who had suffered from severe nerv-
" ous shock.   *   *   *   She did not exaggerate her injuries to Dr.
" Parham, for that gentleman so testifies though produced as a witness
" for the defendant, nor do I believe that she exaggerated when on the
" witness stand. Soon after she began testifying, the discrepancies as
" to times and dates made me doubtful, and I confess to a feeling of
" incredulity in consequence as to the extent of her injuries, but I soon,
" upon careful observation, formed the fixed belief that the girl was
" unassuming, artless, candid, and truthful."

       *       *       *       *       *       *       *

"I do not know how to estimate in money all that this child suffered
" —acute pain, nervous rigors, aching head and limbs, sleepless nights,
" worrisome hours; how can this be measured in money? For a young
" girl to be knocked prostrate and senseless upon the public streets,
" powerless to remove herself from the sight of strangers, and depend-
" ent alone for assistance upon stranger hands, this alone is a fearful
" ordeal for a lady."

The case which is thus presented is that which is made out by the
evidence, and whilst the amount allowed seems high when compared
with the amounts allowed in many other cases, each case has its own
peculiar features, and in view of those which are here disclosed, we are
not prepared to disturb the findings of the district judge, whose oppor-
tunities for reaching a correct conclusion as to the most important par-
ticulars were much better than ours are.

Nor can we find any sufficient reason for disagreeing with him on the
subject of the distribution of the liability. The pole which inflicted the
injury belonged to the Edison Company, and, by the gross negligence of
that corporation, was in a condition threatening danger to all who
passed near, even though upon the opposite side of the street. But it
had stood, up to the time that the Telephone Company caused the

excavation to be made about its base, and we think that the evidence justifies the belief that the making of this excavation was not only the occasion, but a contributing cause of the falling of the pole at that time. True the pole fell in the direction of the side upon which it was still supported by the curb stones. True, also, the stump remained in the socket in which it had been originally placed and was taken out with some difficulty. Nevertheless, upon two sides of the stump was the hole, four or five feet in diameter, which the Telephone Company had caused to be dug. And with a high wind blowing, the tall pole most likely swayed in the direction of no resistance and coming back against the curb stone produced a shock, or concussion which was all that was needed to break it at the rotten place near the surface of the ground. Even if the pole had been sound, it would have been grossly careless to have left it, as it was left after the digging of the hole alongside of it; but, being, as it was, a rotten pole, the condition of which was known, or partly known, to the superintendent of the Telephone Company, according to his own testimony, the conduct of the company in the premises, was little short of criminal negligence.

The judgment appealed from is, therefore, affirmed.

Rehearing refused.